# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

HAROLD BRUCE SHEEHAN, II,      )
                                    )
        Plaintiff,           )
                                    )
v.                                )      Case No.: 1:14-CV-324
                                    )
NOBLE COUNTY SHERIFF'S DEPT.,    )
et al.,                             )
                                    )
        Defendants.      )

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment and memorandum in support filed by Defendants Noble County Sheriff's Department, Deputy Sheriff Chris Moriarity, Deputy Sheriff Brandon Chordas, Confinement Officer Tyler Barrientes, Sergeant Elizabeth Roehm, Confinement Officer Ryan Morrison, Confinement Officer Erick Keirn, and Confinement Officer Richard Williams (docket entries 85 and 86).[1] Plaintiff Harold Bruce Sheehan, who is incarcerated and is proceeding *pro se*, filed a response in opposition to the motion (DE 96) and the Defendants filed a reply brief (DE 98). The Defendants also filed a motion to strike Sheehan's response brief (DE 99) and Sheehan filed a response (which he titled "Plaintiff's Motion Seeking Court's Leave to Extend 25-Page Limit for Plaintiff's Reply" (DE 100)). For the reasons discussed below, the motion to strike (DE 99) is DENIED and the motion

---

[1] The Plaintiff named two other Noble County Jail confinement officers and a "Sargent Shift Supervisor" as defendants, all sued as "John Does" since he was unable to identify them. Complaint (DE 4). The Court dismissed the "John Doe" defendants in an order issued on June 12, 2015 (DE 18).

for summary judgment (DE 85) is GRANTED in part and DENIED in part. The motion for summary judgment is GRANTED as to the Plaintiff's claims for denial of medical care and GRANTED as to his claim against the Noble County Sheriff's Department under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The motion for summary judgment is DENIED as to Plaintiff's claims for excessive force against Defendants Moriarity, Chordas, Roehm, Barrientes, Morrison, Williams, and Keirn. This case will be set for a status and scheduling conference by separate order.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

Also, it is well established that *pro se* pleadings are to be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Accordingly, the Court must apply a liberal reading to Sheehan's complaint. *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015) (citing *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). *See also, Greer v. Board of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001) (courts must liberally construe the pleadings of individuals who proceed *pro se*."). With these standards in mind, the Court turns to the issues at hand.

## BACKGROUND

Plaintiff Harold Sheehan and a friend were at a bar in Fort Wayne on the evening of October 15, 2013. The two men left the bar in the early morning hours of October 16 and were "headed towards the Plaintiff's family's residence in Noble County[]" when they "ran off the road due to stormy weather conditions[]" and ended up in a ditch. Complaint, pp. 7-8. The men

tried to get the vehicle out of the ditch but were unable to do so. *Id*., p. 8. Sheehan's friend walked to a nearby home for help. *Id*. Sheehan notes that "[t]he time was approximately 2:50 a.m." *Id*. While his friend was looking for help, Sheehan "fell asleep in the truck until help came." *Id*. Sheehan says he was asleep in the truck when he "was awoke [sic] by Defendant Deputy Brandon Chordas . . . and was told to exit the vehicle." *Id*. A second sheriff's deputy, Defendant Chris Moriarity, "approached the Plaintiff and began to assertively question [him.]" *Id*. Sheehan alleges that Moriarity "then placed the Plaintiff into handcuffs without any resistance . . ." and later "told the Plaintiff he was under arrest for D.U.I. and H.T.O." *Id*.[2] Sheehan admits that after he was handcuffed he "began to argue his side of the story although he was in fact intoxicated, but the Defendant, Moriarity, told him to 'tell it to the judge.'" *Id*., p. 9. According to Sheehan, that's when things really went south. He claims that Chordas and Moriarity shoved him, used a taser on him, choked him (to the point that he could not breath), "threw the Plaintiff into the back of the squad car," and then "both officers began assaulting the Plaintiff, Chordas striking the Plaintiff's legs, and Moriarity the Plaintiff's face." *Id*. Sheehan claims that while he was subjected to this use of force both officers kept telling him to "stop resisting," even though, according to Sheehan, he was not resisting at all and "was in restraints and in the squad car unable to move due to the fact of him being choked, punched, and elbowed." *Id*., p. 10. Sheehan alleges that "[t]he shock from the assault then caused the Plaintiff to go unconscious." *Id*. Sheehan alleges that the actions of Chordas and Moriarity constitute excessive force.

---

[2] The acronym "H.T.O." stands for habitual traffic offender.

Sheehan also alleges that once he was transported to the Noble County Jail he was subjected to even more abuse. He claims that he was placed in a restraint chair and that confinement officer and Defendant Erick Keirn began yelling obscenities at Sheehan, telling him to "fuck off," calling him a "piece of shit" and threatening to "beat the Plaintiff's ass." *Id*., p. 11. Sheehan also claims that Keirn later moved him, while Sheehan was still in a restraint chair, "to a location in the . . . lockup that is not under surveillance" and beat him "in his chest and mid section." *Id.*, p. 12. Sheehan claims that this beating by Keirn caused him to lose consciousness again and "caused the Plaintiff to bleed from his nose and mouth." *Id*. At some point later, Sheehan asked Defendant Roehm to let him out of the restraint chair, which she did. *Id*. He states that he told Roehm that he was in pain and wanted to see a nurse. Sheehan insists that he was asking for medical attention but his request "was denied . . . for no apparent reason." *Id*. He alleges that for "well over 10 hours . . . the Plaintiff repeatedly asked for medical attention, grievance forms, and to speak with a Sargent." *Id*., p. 13. Sheehan admits that "[a]t 7:30 a.m. the Plaintiff did a [blood alcohol test] and the result was .14." *Id*. (In Indiana, an individual is deemed to be intoxicated as a matter of law if he or she has "an alcohol concentration equivalent to at least eight-hundredths (0.08) gram of alcohol but less than fifteen-hundredths (0.15) gram of alcohol per . . . one hundred (100) milliliters of the person's blood; or two hundred ten (210) liters of the person's breath[.]" Ind. Code Ann. § 9-30-5-1. A BAC measuring above 0.15 subjects the individual to more serious charges. *See* I.C. § 9-30-5-3.) Sheehan "posted bond around 10:30 p.m. that same day[]" and was released. *Id*. Even after he was released, Sheehan claims he tried to file a complaint or grievance about his alleged mistreatment but was told he could not do so. *Id.*, p. 14.

Sheehan was released after spending approximately 19 hours in the Noble County Jail.

Based on those factual allegations, Sheehan asserted the following claims against the various Defendants in this case:

1) a claim against the Noble County Sheriff's Department based on a "failure to train" theory–claiming the Sheriff's Department "fail[ed] to adequately train employees in the proper use of force" . . . in violation of "the Plaintiff's 4th Amendment rights . . . ." Complaint, p. 15;

2) a claim against "the Noble County Jail based on its alleged "policy and custom in the delay of medical attention to intoxicated detainees . . . ," which he claims "violates the Plaintiff's 8th Amendment rights[.]" *Id*.;

3) a claim against Chordas and Moriarity for "using excessive force during the arrest of the Plaintiff," which he claims violated his Fourth Amendment rights. *Id*.;

4) a claim against Defendants "Morrison, Williams, and Keirn "for the unjust use of force while the Plaintiff was in the jail, which was also cruel and unusual punishment" in violation of the 8th Amendment. *Id*., p. 16; and

5) a claim against Defendants Roehm and Barrientes "for failing to curb the actions of their coworkers in the physical torture and abuse" Sheehan claims he suffered in the jail, which he says was a violation of his 8th and 14th Amendment rights. *Id*.

Also in his complaint, Sheehan requested "a [declaratory] judgement" asking the Court to declare that he was the victim of "physical abuse," "assault and battery," and other acts that he claims violated his constitutional rights; "an injunction to Defendant Noble County Sheriff's Department and agents thereof" ordering them to "[p]erform adequate medical attention to anyone

who enters the jail regardless of the time of day or how intoxicated an individual may or may not be" and "[t]o train or teach every single employee different techniques of force that can still be used without causing severe physical and emotional harm."; compensatory damages of $50,000; and "punitive damages" of "$10,000 against each Defendant[.]" *Id.*, pp. 18-19.

The Defendants, not surprisingly, present a very different account of what took place on October 16, claiming that any use of force against Sheehan was reasonable and necessary under the circumstances (since, they say, Sheehan was belligerent and combative), and submit "dashcam" videos from police cars and videotapes from the jail that they claim prove the Defendants did nothing wrong–either during Sheehan's arrest or during the time he was held at the Noble County Jail. They seek summary judgment on all of Sheehan's claims, arguing that the evidence they have submitted establishes that there are no material issues of fact that warrant a trial. Defendants' Memorandum, generally; Defendants' Exhibits A-F (DE 87).

## DISCUSSION

### I. The Court's Opinion and Order of June 12, 2015

Because Sheehan is incarcerated, the Court reviewed his complaint pursuant to 28 U.S.C. § 1915A. "Under 28 U.S.C. § 1915A, a district court must review the complaint in all civil actions in which a prisoner seeks redress from a governmental entity, officer or employee. The court is tasked with identifying cognizable claims and dismissing those that fail to state a claim upon which relief may be granted." *Wheeler v. Talbot*, 770 F.3d 550, 553 (7th Cir. 2014). The Court reviewed Sheehan's complaint and considered the many claims he asserted. The Court issued an order on June 12, 2015, making the following holdings:

7

1) granting Sheehan "leave to proceed against Deputy Sheriff Chris Moriarity, Deputy Sheriff Brandon Chordas, Confinement Officer Tyler Barrientes, Sergeant Elizabeth Roehm, Confinement Officer Ryan Morrison, Confinement Officer Erick Keirn, and Confinement Officer Williams in their individual capacities for compensatory and punitive damages for excessive uses of force in violation of the Fourth Amendment on October 16, 2013.";

2) granting Sheehan "leave to proceed against Sergeant Elizabeth Roehm and Confinement Officer Erick Keirn in their individual capacities for compensatory and punitive damages for denying him medical treatment in violation of the Fourth Amendment on October 16, 2013.";

3) granting Sheehan "leave to proceed against the Noble County Sheriff's Department for compensatory damages based on the policy of denying medical treatment to intoxicated inmates,";

4) dismissing Defendants Noble County Jail, John Doe #1, John Doe #2, and Sgt. John Doe; and

5) dismissing *all other claims*.

Opinion and Order (DE 18), pp. 7-8 (italics added). So, at the time of the initial screening of Sheehan's complaint pursuant to §1915A, the Court concluded that some of his claims were sufficiently pleaded while others had to be dismissed because they were factually insufficient or failed as a matter of law. *Id*., generally. The three claims enumerated above, then, are the only claims remaining in this case. At the summary judgment stage the record, obviously, is more fully developed and the Court can delve deeper into the evidence to determine the viability of Sheehan's remaining claims; that is, to determine whether there are any genuine issues of material fact that preclude summary judgment on any of those claims. And indeed there are, as the Court will discuss below.

## II. Defendants' motion to strike Plaintiff's response brief

Before discussing the motion for summary judgment, the Court will address the Defendants' motion to strike (DE 99). The Defendants argue that Sheehan's response brief "grossly exceeds the page limits permitted by the rules and the excess pages should be stricken." Defendants' Motion to Strike, p. 1 (citing N.D.Ind. L.R. 7-1(e)(1) and *Evans v. U.S. Dep't of Interior*, 135 F.Supp.3d 799, 810 (N.D.Ind. 2015)). (Sheehan's response brief is 65 pages long.) Alternatively, the Defendants argue that if the Court excuses Sheehan's transgression it should still strike specific portions of his response because Sheehan makes "factual assertions that are contradicted by the record and his deposition testimony[,]" and "conclusory allegations that lack any evidentiary support and are merely conjectural and speculative." *Id.*, pp. 3-8.

In his response to the motion to strike, Sheehan explains that his violation of the page limit rule was unintentional and asks the Court to overlook it. Plaintiff's "Motion Seeking Court's Leave to Extend 25-Page Limit" (DE 100), p. 1. He also argues that he has to hand write all of his pleadings and as a result his pleadings are longer than they would be if they were typed, and that he was unaware of the rules regarding page limits since he had only limited access to the prison law library. *Id.*, pp. 1-3. (He does not respond to the Defendants' alternative argument regarding striking specific portions of his brief.)

Sheehan clearly violated Local Rule 7-1(e)(1). The question for the Court is what, if anything, to do about it. On the one hand, "pleadings that improperly circumvent page limits are . . . subject to being stricken by the court." *Evans*, 135 F.Supp.3d at 810. At the same time, "[w]hile

it is 'well established that pro se litigants are not excused from compliance with procedural rules,' *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008), whether the Court holds *pro se* litigants to the consequences of violating the Court's Local Rules is a matter of discretion." *Gibson v. Gadberry*, 2016 WL 6124979, at *1 (S.D.Ind. Oct. 20, 2016) (citing *Gray v. Hardy*, 826 F.3d 1000, 1004-05 (7th Cir. 2016) (holding that district courts are not required to hold pro se litigants to the potential consequences of their failure to comply with the Local Rules and can instead take "a more flexible approach," including ignoring the deficiencies in their filings and considering the evidence they submit)).

In this case, the Court is not inclined to strike any part of Sheehan's response brief, which would be too harsh a penalty for his unintentional violation of L.R. 7-1(e)(1). Doing so also wouldn't accomplish anything other than to penalize Sheehan. Sheehan's brief is long because it goes into tremendous (and often excessive) detail about the events giving rise to this lawsuit, and also because much of it is repetitive–both of which are common failings in *pro se* pleadings since plaintiffs feel compelled to leave no stone unturned in recounting their version of the facts. Plus, Sheehan's arguments and the facts he presents in opposition to summary judgment are easy to discern just from the first 25 pages of his brief, so striking the remainder would be rather pointless. Most importantly, the Court has reviewed every page of every brief filed by both sides, together will all the evidence submitted by both, including all 65 pages of Sheehan's response brief. The Court concludes that even if most of Sheehan's brief were stricken, it would have no impact on the Court's analysis or conclusions with regard to the Defendants' motion for summary judgment.

As to striking specific parts of his brief, the Defendants are correct that Sheehan includes in his response brief several statements or assertions that arguably "contradict" other evidence, or which are conclusory or speculative. It is not necessary for the Court to enumerate or discuss all these alleged inadmissible statements (the Defendants do that on pages three through eight of their motion to strike). Most of the alleged contradictory or conclusory statements the Defendants ask the Court to strike are barely if at all relevant now (although they might be at trial), and many are downright nitpicking. For example, the Defendants argue that "on pages 15 and 44 the Plaintiff alleges that he went to the Emergency Room at DuPont Hospital where he received three pain medications and 'his wounds were treated.' While the Plaintiff was prescribed pain medication, the medical records do not reflect any diagnosis or treatment for wounds or other injury. Such statements should be stricken." Motion to Strike, p. 3. Strictly speaking, this argument is correct–the medical evidence does not indicate specifically that Sheehan was treated for "wounds" or "injury," but rather for generalized complaints of pain. But the relevant fact here is that Sheehan did go to the emergency room (and later to his family doctor for a follow up). His statement that "his wounds were treated" is, in fact, a bit misleading and perhaps the phrase "his pain was treated" would be more accurate. But this is verging on a semantical debate that will do nothing to resolve the issues now before the Court. As to inadmissible conclusions or speculation, the Defendants claim that "[o]n page 8 [Sheehan] asserts that Defendant Williams' physical contact with him was not a pressure point but an unlawful application of force that was meant to injur[e] and humiliate the Plaintiff.' The Plaintiff has no personal knowledge or basis to know that Williams intended to hurt or humiliate the Plaintiff." *Id*., p. 4. So, the Defendants want the Court

to strike that statement since Sheehan obviously cannot testify about what was in Williams' mind at the time of the alleged physical encounters in the jail. Whew! These arguments really take things deep into the weeds. The Court could dedicate many more pages to discussing each of the statements the Defendants argue should be stricken, but fortunately that's not necessary. It is sufficient to note that many of them cast doubt on Sheehan's credibility, which is the real reason the Defendants bring them up in the first place. But credibility issues are precisely the reason the Defendants' motion for summary judgment fails (at least as to the excessive force claims). In other words, the Defendants' arguments in their motion to strike actually serve to illustrate why their motion for summary judgment must be denied. How's that for irony? It is a jury's job, not the Court's, to determine whether Sheehan is exaggerating or lying about certain facts, and the same goes for the Defendant officers.[3] For all of these reasons, the Defendants' motion to strike Sheehan's response brief, in whole or in part, is denied.

### III. Summary judgment arguments

#### A. Summary of Court's review of audio, video, and documentary evidence.

The video and audio tapes submitted by the Defendants reveal that Sheehan was loud, verbally combative, at times incoherent, and quite obviously intoxicated. But the evidence is not

---

[3] The Defendants could also be accused of exaggerating the facts, or at least "spinning" them. For example, the Defendants claim that once Sheehan was placed in a holding cell, he "continued to display erratic behavior and act out violently while in the cell. Sheehan continued to be a threat to the safety of himself, as evidenced by his refusal to follow repeated instructions not to kick the [cell] door and throwing of the phone against the wall, damaging jail property." Defendants' Memorandum, p. 15. The video of Sheehan in the jail cell does in fact show him "kicking" the door of the cell, although rather meekly, and tossing the phone against the wall, but the characterization of this behavior as "act[ing] out violently" is a stretch.

sufficient to prove, as the Defendants contend, that the use of force against Sheehan, both during

his arrest and in the jail, was reasonable under the circumstances. First, the videos from

Moriarity's and Chordas' dash cams actually add to the confusion rather than clearing things up.

The video from Moriarity's patrol car shows nothing of the physical altercation between Sheehan

and the officers since they are not caught on camera. The video from Chordas' patrol car is also

not conclusive since very little of the encounter is visible. The video shows mostly the emergency

lights of Moriarity's patrol car (which was parked directly in front of Chordas' car) flashing on the

screen and the physical altercations between Sheehan and the officers are shrouded in darkness.

The video taken in the sally port of the jail is a different story. That video (which does not include

audio) shows two officers–Moriarity and Williams–striking Sheehan forcefully on his legs several

times as they secured him in the restraint chair. The Defendants explain that since Sheehan was

being uncooperative "Moriarity and Officer Williams began applying strikes to the common

peroneal area pressure points in Sheehan's thighs in an attempt to get him to bend his legs and sit

in the chair." Defendants' Memorandum, p. 5. While this was taking place, Defendant Keirn was

holding Sheehan's head in his hands to limit his movements. The Defendants contend that

"Officer Keirn performed a mandibular angle on Sheehan to prevent him from thrashing his head

and harming himself or the officers while Sergeant Roehm and Officer Barrientes helped Sergeant

Moriarity and Officer Williams secure Sheehan to the restraint chair." *Id.* These are clinical ways

of saying that the officers struck Sheehan several times with their fists or elbows because, they

maintain, that was the only way to secure him since he was resisting officers' orders to exit the

patrol car and get into the restraint chair. Sheehan, of course, was still handcuffed at the time. He

was not scuffling with officers or striking out at them in any way, although it does appear that he was resisting their attempts to place him in the restraint chair by refusing to bend his legs. That portion of the video, showing the officers hitting Sheehan in his legs, is disconcerting. A jury might accept the Defendants' explanation and conclude that the officers were only "applying strikes to the common peroneal area pressure points in Sheehan's thighs." But a jury might also conclude that those "strikes to pressure points" were punches that constitute excessive force given the totality of the circumstances. The Defendants' argument boils down to this: they contend that Sheehan was verbally and physically combative from the time Moriarity and Chordas first encountered him, that this combative behavior continued throughout his arrest, transport to jail, and while he was detained, and that officers had no choice but to use physical force to subdue him. Sheehan argues that the force used against him was excessive notwithstanding his combative behavior. The audio recordings from the early morning hours of October 16, 2013, lend credence to the Defendants' version of events, in that they capture Sheehan's combative and argumentative behavior and the officers' repeated commands for him to stop resisting. The video recordings on the other hand, especially the ones from the arrest, raise more questions than they answer, since all of the physical struggles between Sheehan, Moriarity and Chordas take place either out of camera range or are not visible due to darkness and the fact that the lights of Moriarity's patrol car impede visibility. While the audio recordings are more helpful than the videotapes, they too fail to "prove" either side's version of events. A summary of what is heard on the recordings will help provide context.

The dash cam video recordings from the scene of Sheehan's arrest are the only recordings submitted by the Defendants that include audio–there is no audio on the video from the sally port or the videos from inside the jail. The audio begins with a calm conversation between Moriarity and Sheehan as Moriarity asks about the accident and whether Sheehan had been drinking. Minutes later a scuffle can be heard as the officers are trying to get Sheehan into Moriarity's patrol car. Sheehan can be heard saying repeatedly, "I don't understand!" Moriarity (and perhaps Chordas) can be heard breathing very hard, as if they are struggling with Sheehan, but the actual physical encounter is not visible. Moriarity can be heard repeatedly yelling at Sheehan to "get into the car!" and "stop resisting!" and "bend your legs!" Sheehan begins yelling "why are you doing this?" and "I'm asking you a question!" This goes on for several minutes, with the officers (mostly Moriarity) continuously yelling at Sheehan to "stop resisting!" and "bend your legs!" while Sheehan can be heard continuously yelling "why you hitting me?" "why you choking me?" and "why are punching me in the face?" Eventually, Moriarity warns Sheehan that if he does not cooperate and stop resisting, the officer would use his taser. At one point, when Moriarity yells "bend your legs!" Sheehan responds by saying "what are you doing to my nose?" The officer responds, "I'm using a pressure point–get into the car!" Moments later Sheehan yells "why you punching me?" and Moriarity responds, "I want you to bend your legs!" A couple minutes later, Sheehan is heard asking repeatedly, "why are you punching me in the face?" Even after Sheehan is finally in the back seat of the squad car he can still be heard yelling "why are you punching my face?" At that moment, neither officer appears to be making physical contact with Sheehan. After another two or three minutes, Moriarity can be heard talking on a radio advising someone

(presumably someone at the jail, although that's not clear) that he had to use his taser to subdue his arrestee. Most of the rest of the audio was recorded in Moriarity's squad car as the officer was transporting Sheehan to jail. Sheehan can be heard yelling many things, including "I didn't drive shit," "who are you, huh?" "why did you assault me?" "why did you beat on me?" "you're holding me against my will!" "I don't wish to be here right now!" and "you're confining me against my will!" This goes on for several minutes almost without pause. Near the end of the recording, Sheehan is heard repeatedly yelling "help, help!" "who are you?" and "help, please help!" Moriarity says nothing during this time, and continues to drive to the Noble County Jail. Additional evidence from the recordings, as well as the documentary evidence submitted by the parties, will be discussed below as it becomes pertinent to the Court's analysis.

### B. Excessive force claims.

In his complaint Sheehan references the 4th, 8th and 14th amendments as the basis for his claims. However, as the Court explained in its prior order, "'[t]he relevant legal standard for arrestees who have been seized but who have not yet had their probable cause hearing . . . comes from the Fourth Amendment, not the Fourteenth, and certainly not the Eighth.'" Opinion and Order (DE 18), p. 4 (quoting *Currie v. Chhabra*, 728 F.3d 626, 631 (7th Cir. 2013)). Since Sheehan had not had a probable cause hearing before the events that are the basis for his lawsuit, "the Fourth Amendment applies to all of his claims." *Id*., p. 5.

The question in Fourth Amendment excessive force claims is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Conner*, 490 U.S. 386, 397

(1989). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). The question is "whether the totality of the circumstances" justifies the officers' actions. *Graham*, 490 U.S. at 396. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id*. (quoting *Johnson v. Glick*, 481 F.2d 1028,1033 (2d Cir. 1973)).

The audio recordings reveal that Sheehan was combative and argumentative during his entire encounter with Moriarity and Chordas at the scene of his arrest and that there was at least some physical scuffle or struggle between Sheehan and the officers. What they don't do is prove that the force used to subdue Sheehan was reasonable, as the Defendants argue. And the videotapes don't provide a basis for summary judgment since so little is visible on them. In a sense, the Defendants' arguments are doomed by adverbs–such as the words "clearly," "blatantly," and "overwhelmingly." *See* Defendants' Memorandum, p. 15 ("video *clearly* contradicts [Sheehan's] testimony"); p. 17 ("The record *overwhelmingly* establishes that Sheehan did not sustain any injuries . . . ."); p. 22 ("The videos *clearly* show that Sheehan refused to comply with officers' commands . . . ."); p. 24 ("The record *blatantly* contradicts Sheehan's allegations . . . .") (italics added). The Defendants use these adverbs repeatedly throughout their briefs to attempt to convince the Court that the video and audio evidence proves that Sheehan was not subjected to a constitutionally violative use of force–that is, that the force used was reasonable given Sheehan's uncooperative and belligerent behavior. That may very well be the case, but a

jury will have to make that ultimate determination because the evidence is just not as clear or overwhelming as the Defendants insist.

The problem is this. The evidence does not, as the Defendants contend, "clearly" contradict or "blatantly" contradict or "overwhelmingly" establish anything. There are indeed contradictions between Sheehan's allegations and the video and audio evidence. But that evidence does not, as the Defendants insist, resolve the ultimate contradiction in this case–that is, the contradiction between the Plaintiff's and the Defendants' versions of events. Simply put, the evidence is inconclusive. The audio evidence reveals that Sheehan was verbally combative almost the entire time from his initial encounter with officers until he was taken to jail (and the Defendants contend that this combative behavior continued during most of his 19-hour incarceration). This evidence lends credence to the Defendants' version of events and their explanation for why the defendant officers' use of force was reasonable. The video evidence, on the other hand, works the other way. The videos from the arrest, i.e., the dashcam videos, are of little help given that the physical altercations between Sheehan and the officers trying to subdue him are not visible. And the video from the sally port shows two officers striking Sheehan forcefully in his legs while a third officer held Sheehan's head. And while Sheehan may not have been fully cooperative at that point, he was also handcuffed and was not striking out at officers or thrashing about. But yet again, the video does not "clearly" or "blatantly" or "overwhelmingly" establish anything. A jury could reasonably conclude that Sheehan brought all this on himself by being verbally and physically combative. At the very least, Sheehan's behavior, as caught on audio and video, is not likely to endear him to a jury. On the other hand, a jury could also

reasonably conclude that the amount of force used by officers both during Sheehan's arrest and in the sally port was excessive under the totality of the circumstances. Should a suspect who concedes he was drunk, and whom the Defendants contend was in an "extreme level of intoxication," be subjected to the level of force that was used against Sheehan? The audio and video evidence just isn't enough to answer this ultimate question of whether the physical force used against Sheehan by the defendant officers was reasonable or excessive based on the totality of the circumstances.

While the Defendants' arguments are doomed by adverbs, this case must move forward because of a noun. This case boils down to credibility, and only a jury can make those determinations so as to sort out the truth. While it is true, as the Defendants argue, that "'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Defendants' Memorandum, p. 10 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) and *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016)). In the present case, however, the contradictions almost all raise credibility issues–even in light of the audio and video evidence. The Defendants' repeated use of the words "clearly," "blatantly," and "overwhelmingly" are a linguistic jujitsu designed to convince the Court that the defendant officers' actions were reasonable as a matter of law. But any way you cut it, the resolution of Sheehan's excessive force claims comes down to credibility. Neither Sheehan's version of events *nor* the Defendants' version is clearly or blatantly or overwhelmingly proven by the evidence before the Court. Testimony by Sheehan and the Defendants in front of a

jury is the only way the Plaintiff's claims can be properly assessed.

What exists in this case is more than "metaphysical doubt as to the material facts." Most importantly, accepting the Defendants' position–that the audio and video tapes establish "clearly" or "overwhelmingly" that the Defendants did not use excessive force against Sheehan–would require the Court to cross the nebulous line between reasonable inferences and a weighing of the evidence. The latter, of course, is the sole province of a jury. For all of these reasons, the Defendants' motion for summary judgment is denied as to Sheehan's excessive force claims against Defendants Moriarity, Chordas, Barrientes, Morrison, Keirn, Roehm, and Williams.[4]

Sheehan also asserts a claim of excessive force against Keirn based on his allegations that Keirn took him, while Sheehan was still in the restraint chair, "to a location in the Noble County Jail lockup area that's out of view of monitoring devices." Complaint, p. 5. Sheehan claims that Keirn then "began 'hammer fisting' the Plaintiff in his chest and mid section[,] . . . then proceeded to strike the Plaintiff the same way in his face several times, until again, the Plaintiff lost consciousness. These assaults caused Plaintiff to bleed from his nose and mouth." *Id.*, p. 12. In his deposition testimony, Sheehan went into more detail about this alleged assault. He testified that he

---

[4] It is well established that "in a § 1983 action alleging that police violated the plaintiff's Fourth Amendment rights by subjecting him to excessive force, a defendant police officer may be held to account both for his own use of excessive force on the plaintiff . . . as well as his failure to take reasonable steps to attempt to stop the use of excessive force used by his fellow officers[.]" *Sanchez v. City of Chicago*, 700 F.3d 919, 925–26 (7th Cir. 2012) (internal citations omitted). So, while Sheehan does not allege that either Roehm or Barrientes used excessive force against him (or any force, for that matter), he does allege that they are liable for failing to intervene to stop the other Defendants from doing so. Complaint, p. 6. If a jury finds that Sheehan was subjected to excessive force while being held at the Noble County Jail, they could also conclude that Roehm and Barrientes are liable for not intervening to prevent or stop it.

exchanged words with Keirn and "[t]hat's when he took me in the chair, took me over to where the sally port is and he is behind me . . . and then that's when he started . . . striking me from behind . . . ." Sheehan Deposition (DE 86-12), p. 47. Sheehan testified that Keirn "hit me on my chest, my chin, my face, my nose, my abdomen a couple times." *Id*. For his part, Keirn states in his affidavit that "[n]either I nor any other officer used any force against Sheehan at any time while he was secured in the restraint chair." Keirn Affidavit (DE 86-10), p. 3.

Once again, the Defendants argue that Sheehan's allegation about Keirn is "blatantly contradicted by the record" and therefore they are entitled to summary judgment on this claim. And once again, they are wrong. The Defendants argue first that "Sheehan's version of the facts is patently unreliable due to his extreme level of intoxication[.]" Defendants' Memorandum, p. 17. The Defendants also point out that while "Sheehan alleges he sustained injuries and required medical attention, . . . the record demonstrates otherwise. Sheehan did not show any indications of bleeding or injury while in the jail." *Id*. (citing affidavits of Morrison and Keirn). The Defendants also note that when Sheehan was released from the jail, but before he left the building, he insisted that a deputy, Sergeant Terry Waikel, take pictures of what Sheehan said were his injuries, and that "the photos do not reveal any sign of injury; only marks from the taser points and to [Sheehan's] wrists from pulling against the restraint chair." *Id*. (citing Waikel affidavit). Finally, the Defendants note that Sheehan went to the emergency room on October 17 "where he underwent a full examination, including a CT scan, which did not identify any medical issues, and

he was sent home with pain medication." *Id*.[5] Based on these facts, the Defendants argue that "[t]he record overwhelmingly establishes that Sheehan did not sustain injuries to his face, nose, and chin that he alleges resulted from Officer Keirn striking him while he was retrained in the chair." *Id*. The Defendants conclude by arguing that "[t]he Court should not rely on Sheehan's version of the facts and should find that Officer Keirn, as well as all of the other Defendant officers, did not use excessive force against [him]." *Id*. In other words, the Defendants are saying "don't believe him, believe us," which is the same as asking the Court to make credibility determinations. The evidence submitted by the Defendants puts Sheehan's credibility at issue; but it does not "overwhelmingly establish" that his allegations are fanciful. For these reasons, Sheehan's claim against Keirn for excessive force survives the motion for summary judgment.

### C. Denial of medical care.

As stated, since Sheehan was an arrestee at the time of the events giving rise to this

---

[5] The Defendants included copies of the photographs and copies of Sheehan's medical records from his emergency room visit. *See* Defendants' Memorandum (DE 86-15 (photos) and DE 86-18 (medical records)); Sheehan also submitted copies of the photographs. *See* Plaintiff's Exhibits (DE 95, pp. 1-4). The Defendants are correct that the photographs (one of the back of Sheehan's head, two of his arms, and one of his leg) do not show any blood or cuts on Sheehan (although there are no pictures of his face) and do seem to show some bruises on his wrists and leg. Sheehan, however, testified in his deposition that he was bleeding "[j]ust barely in my nose and my mouth. I could taste it." Sheehan Deposition (DE 86-12), p. 53. Defense counsel then asked Sheehan whether his alleged bleeding was "flowing . . . all over your clothes or anything like that?" Sheehan answered "No." *Id*. This might explain why there are no pictures showing any blood on Sheehan. The medical records, as the Defendants state, reveal that Sheehan went to the DuPont Hospital emergency room on October 17, 2013, complaining of various aches and pains and telling doctors that he was tased and "beat up by police" the day before. The records also reveal that Sheehan was examined, that no medical issues or problems were discovered or treated other than his complaints of pain, and that he was given pain medication and released. (DE 86-18), pp. 2-17.

lawsuit, it is the Fourth Amendment "objectively reasonable" standard that applies to his claim for

denial of medical treatment. *Williams v. Rodriquez*, 509 F.3d 392, 402-03 (7th Cir. 2007) (citing

*Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006)). This is a lesser standard than the

"deliberate indifference" standard that would apply to such claims by pretrial detainees and

convicted inmates. *Id*. at 403-04. Even so, Sheehan does not meet the standard and the Defendants

are entitled to summary judgment on this claim.

The standard used to assess the reasonableness of a defendant's conduct regarding claims

for denial of medical treatment was set forth in the case of *Hobson v. Dominguez*:

> To analyze whether a defendant's conduct is objectively unreasonable under the
> Fourth Amendment, courts evaluate four factors. *Williams v. Rodriquez*, 509 F.3d
> 392, 403 (7th Cir. 2007); *see also Sides v. City of Champaign*, 496 F.3d 820,
> 827–28 (7th Cir. 2007). First, a court must consider whether a defendant was on
> notice of the medical need. Second, a court must consider the seriousness of the
> medical need, though "[t]he severity of the medical condition under this standard
> need not, on its own, rise to the level of objective seriousness required under the
> Eighth and Fourteenth Amendment." *Williams*, 509 F.3d at 403. Third, a court
> must consider the scope of the requested treatment, which a court must balance
> against the seriousness of the medical need. Fourth, a court must consider "police
> interests" which are "wide-ranging in scope and can include administrative,
> penological, or investigatory concerns." *Id.*

*Hobson v. Dominguez*, 2012 WL 4361537, at *7 (N.D. Ind. Sept. 24, 2012).

In this case, Sheehan alleges that the Defendants were on notice that he had a physical

condition that warranted medical attention because he told them so many times (that is, he

complained about experiencing pain). There is no evidence, and in fact Sheehan does not allege,

that he complained to anyone about a specific health condition or injury. The only thing the

Defendants were on "notice" of is that Sheehan was complaining about pain as a result of being

tased and because of the force used on him by officers, and wanted to see a nurse. But notice of an

arrestee's *complaints* is different from notice of a "medical need." (Otherwise, it would be

"objectively unreasonable" for confinement officers to refuse medical treatment to *any* arrestee

who complained about pain or physical discomfort.) Even if Sheehan's pleas to officers are

assumed to be sufficient to establish that they were on notice of a medical need, he fails to

establish–and in fact the evidence refutes–that his condition was severe enough to render the

Defendants' actions unreasonable. The constitutional right to medical care, whether it derives

from the Fourth, Eighth, or Fourteenth Amendment, applies only to "*serious* medical conditions,"

and Sheehan fails to even raise a material fact issue on this point. Another district court recently

summarized the law regarding "serious medical conditions" in the case of *Orlowski v. Milwaukee

County*:

> In order to determine the "serious medical condition" prong of the plaintiff's
> claim, then, the court must determine whether [the plaintiff's] condition was
> sufficiently obvious that a layperson would have perceived the need for medical
> attention. As the Seventh Circuit has put it, the court must look at whether "a
> factfinder may conclude that a prison official knew of a substantial risk from the
> very fact that the risk was obvious." *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir.
> 1996) (quoting *Farmer*, 511 U.S. at 842). A serious medical condition may not be
> *per se* obvious to a layperson, even when it results in death. *Jones v. Minn. Dep't
> of Corrs.*, 512 F.3d 478, 483 (8th Cir. 2008) (citing *Grayson v. Ross*, 454 F.3d
> 802, 809-10 (8th Cir. 2005) (no objectively serious medical need because it would
> not have been obvious to a layperson that an inmate required immediate medical
> attention even though intoxication resulted in death)). But an inmate has a right to
> prompt medical attention "in life and death situations." *Mathison v. Moats*, 812
> F.3d 594, 597 (7th Cir.  2016).

*Orlowski v. Milwaukee Cty.*, 2016 WL 1611471, at *7 (E.D. Wis. Apr. 21, 2016).  *See also,*

*Salazar v. City of Chicago*, 940 F.2d 233, 241 (7th Cir. 1991) and *Brownell v. Figel*, 950 F.2d

1285, 1291 (7th Cir. 1991) (both holding defendant officers not liable where they interpreted plaintiffs' symptoms as signs of intoxication rather than serious illness).[6]

Virtually all of Sheehan's allegations concerning his denial of medical care claim are asserted against the "John Doe" defendants, whom the Court dismissed from this case in its prior order. *See* Complaint, pp. 6-7. In its prior order, the Court allowed Sheehan to proceed with this claim against Defendants Roehm and Keirn, based on inferences drawn from his complaint that these two defendants allegedly denied or ignored his requests for medical attention. However, the complaint does not contain any express allegations that either Roehm or Keirn personally denied his requests. (He does state in his brief that at one point he "did in fact tell Roehm he was in severe pain from every assault, primarily the tasering[,]" *see* Plaintiff's Response, p. 46, but that's all the elaboration he provides.) In the end it doesn't matter, since Sheehan fails to state a claim for denial of medical care regardless of which defendant or defendants he seeks to hold liable.

Sheehan claims that he was suffering from general pain from the alleged incidents of excessive force and that he experienced bleeding from his nose and mouth after allegedly being struck by Keirn. In his deposition, however, he conceded that no blood flowed down his face or onto his clothing, but that he could "taste it." There is no photographic evidence of any injury to Sheehan's face and no such injury can be seen on any of the videos. He claims he made repeated entreaties to confinement officers for medical attention but was denied or ignored. He had no

[6] *Salazar* and *Brownell* were both decided under the more stringent "deliberate indifference" standard, but are illustrative here.

visible injuries anywhere on his body and, aside from complaining about general severe pain, had all the outward appearances of a highly intoxicated, combative arrestee. Nothing about Sheehan's complaints or his appearance or behavior would suggest to a layperson, let alone a trained jail confinement officer, that he was suffering from any illness or injury that demanded medical attention, let alone treatment. And, as the medical records make clear, Sheehan was examined the next day at a hospital emergency room, underwent a CT scan, was prescribed pain medication for complaints of general pain in various parts of his body, and released without the need for further treatment. Defendants' Exhibits, Medical Records (DE 86-18). The medical records confirm that aside from complaints of pain, for which he was prescribed medication, Sheehan was not diagnosed with any other "wounds," injuries or complaints that warranted treatment. *Id*.

Sheehan argues that officers should have known he had a serious medical condition *and* that it required immediate medical attention, not because he had any obvious signs, but simply because he complained so many times about experiencing pain. He presents no evidence whatsoever that he had any injury or other health condition that could possibly rise to the level of a "serious medical condition" that, in turn, would invoke his constitutional right to medical treatment. Again, this fact is confirmed by the medical records. Recall that a "serious medical condition" must be "sufficiently obvious that a layperson would have perceived the need for medical attention[,]" *Orlowski*, 2016 WL 1611471, at *7, and that is not the case here.

Roehm and Keirn also argue that they are entitled to qualified immunity against Sheehan's claim for denial of medical care. Defendants' Memorandum, p. 24. They contend that "[n]o reasonable officer could believe that Sheehan suffered from anything more than general

soreness from the force needed to secure his compliance while he was sobering up. They are entitled to qualified immunity on Sheehan's denial of medical treatment claim." *Id*. The evidence supports this argument, including the medical evidence and the video evidence of Sheehan in the jail. The Court will address the Defendants' arguments concerning qualified immunity at greater length below, but as to Roehm and Keirn, the position is correct and provides yet another basis for granting summary judgment in their favor on this claim. For all of these reasons, the Defendants are entitled to summary judgment as to Sheehan's claims for denial of medical treatment.

### D. "*Monell*" claim against Noble County Sheriff's Department.

Sheehan claims in his complaint that Defendant Noble County Sheriff's Department is liable to him for depriving him of medical attention during his incarceration. Complaint, p. 3. Sheehan states that he "is suing Noble County Jail for the policy and custom in the delay of medical attention to intoxicated detainees which caused the Plaintiff to undergo severe pain and lack of mobility in his hands, arms, and legs for 19 hours." *Id*. Sheehan claims that "[i]t is a 'custom' that is used in the Noble County Jail that a detainee who is intoxicated may not see the nurse regardless of the health or condition or pleadings for medical attention until the detainee is sober." *Id*.

As the Court explained in its June 12, 2015, order, a "jail is a building; it is not a suable entity." (DE 18-1), p. 6. Accordingly, the Court dismissed the Noble County Jail as a defendant in this case. *Id*. Sheehan's claim is actually against the governmental entity that operates the jail, in this case the Noble County Sheriff's Department. *Kentucky v. Graham*, 473 U.S. 159, 165-66

(1985). Claims against governmental entities (including a county sheriff) based on an allegedly

unconstitutional policy, practice, or custom are permitted under *Monell v. Dep't of Soc. Servs. of

City of New York*, 436 U.S. 658 (1978). Here, Sheehan alleges that the Noble County Sheriff's

Department has a policy, practice, or custom of denying medical care to intoxicated detainees. In

order to prevail on such a claim, Sheehan must plead sufficient facts to show "a pattern or

practice of constitutional violations." *Wade v. Lain*, 2016 WL 2910026, at *1 (N.D. Ind. May 19,

2016) (citing *Monell*, 436 U.S. at 690-91). A recent opinion from the Seventh Circuit

summarizes a plaintiff's burden in such cases (and thereby informs this Court's review). The

court explained as follows:

> To prove an official policy, custom, or practice within the meaning of *Monell*, [a
> plaintiff] must show more than the deficiencies specific to his own experience[.] .
> . . When seeking to rely upon indirect proof, he must come forward with evidence
> that could allow a reasonable trier of fact to find, . . . "systemic and gross
> deficiencies in staffing, facilities, equipment, or procedures in a detention center's
> medical care system." If [a plaintiff] meets this mark, he must then show that a
> policymaker or official knew about these deficiencies and failed to correct them. .
> . . He need not present evidence that these systemic failings affected other specific
> inmates. See *Davis* [*v. Carter*], 452 F.3d [686] at 695 [7th Cir. 2006]] ("To
> establish a widespread custom or policy, the plaintiff here was not required to
> show that Cook County's alleged repeated pattern of delay . . . actually caused
> pain and suffering to other inmates in need of medical intervention. . . .").

*Daniel v. Cook County*, 833 F.3d 728, 734-35 (7th Cir. 2016) (some internal citations omitted).

Sheehan's allegations do not support a *Monell* claim. Even if he were able establish that the

Sheriff's Department had a policy or custom of denying medical care to intoxicated detainees, the

Defendants argue that he still cannot maintain a *Monell* claim since he "cannot show that the

alleged policy is the cause of an injury." Defendants' Memorandum, p. 20. Sheehan does not

allege that his intoxication was the cause of any injuries he claims to have suffered. Instead, he claims he suffered physical pain and suffering as a result of the alleged excessive force used against him. His allegations are insufficient to establish a *Monell* violation in the first place. In his brief, Sheehan recites a great deal of law (complete with citations) regarding *Monell* claims. Plaintiff's Response, pp. 49-56. But simply citing and discussing cases dealing with *Monell* claims, i.e., paying "lip service" to such a claim, is insufficient. A plaintiff asserting a *Monell* claim cannot survive summary judgment when the plaintiff's claim rests solely on conclusory allegations of municipal policy and fails to allege any well pled facts of any occurrence or incidents other than the single incident involving the plaintiff. *Scott v. Buncich*, 2016 WL 5341309, *7 (N.D.Ind. Sept. 23, 2016) (citing *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir. 1985)). Sheehan's only "evidence" of this alleged policy or custom is that he "has been to the [Noble County Jail] three (3) times as an arrestee and was under the influence of alcohol or drugs on all 3 occasions and never saw the nurse any of those times." Plaintiff's Response, p. 53. Sheehan even concedes that "[t]here is no written policy of denying medical care to intoxicated inmates" but then contends that "it is a custom or usage that has been adopted by [the Noble County Jail] and its employees." *Id*. Sheehan fails to present any evidence of this alleged custom and policy other than the fact that he has been detained in the jail three times, was intoxicated on alcohol or drugs each of those times, and never saw a nurse. A conclusory allegation of a *Monell* violation is insufficient to support such a claim and that's all Sheehan presents. For these reasons, Defendant Noble County Sheriff's Department is entitled to summary judgment on Sheehan's *Monell* claim for denial of medical care.

29

### E. Qualified immunity.

One final issue. The Defendant officers argue that they are entitled to qualified immunity in this case. Defendants' Memorandum, p. 22. As to Moriarity and Chordas, the Defendants maintain that Sheehan "refused to comply with officers' commands[,]" ignored the officers' "numerous verbal warnings," that the officers "slowly elevated the use of force after numerous warnings[,]" and conclude with the statement that the arresting officers' "conduct was not so egregious that no reasonabl[e] officer could believe it was not a violation of Sheehan's [constitutional] right[s]." *Id*., p. 23. They make an identical argument as to Defendants Roehm, Morrison, Williams, Barrientes, and Keirn for their conduct at the jail. *Id*. They contend that because Sheehan "refused to sit in the [restraint] chair" the officers had no choice but "to use reasonable force to secure his compliance[.]" *Id*. The Defendants ask the Court to conclude that "[n]o reasonable officer would believe that the use of such conduct to gain the cooperation of an argumentative, noncompliant, highly intoxicated, and resisting inmate would violate the Constitution." *Id*. Finally, as to Keirn, the Defendants argue that he, too, is entitled to qualified immunity because "Sheehan's allegations that Keirn choked him and Sheehan's extreme level of intoxication and the lack of physical injuries . . . make Sheehan's allegations that Keirn beat him while he was restrained in the chair incredible. No reasonable jury could find, or reasonable officer believe, that such conduct violated Sheehan's constitutional rights." *Id*., p. 24.

When a defendant raises the defense of qualified immunity, a plaintiff must show: (1) that the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) that the constitutional right was clearly established at the time of the

alleged violation. *Knight v. Kerstein*, 836 F.Supp.2d 719, 724 (N.D. Ill. 2011). An individual's right to be free from excessive force is, of course, clearly established. "There is no dispute that it is unreasonable for police officers to use excessive force to detain" or arrest an individual. *Thompson v. City of Indianapolis*, — F.Supp.3d —, 2016 WL 5253198, at *5 (S.D. Ind. Sept. 22, 2016). As the Court has already explained, the evidence supports the Defendants' position that Sheehan was combative almost the entire time during his arrest and detention. The evidence, however, is inconclusive as to the amount of force used and whether it was reasonable, given that most of the physical struggles between Sheehan, Moriarity and Chordas during his arrest are not visible on the videos. As the Court has also explained, the reasonableness of the force used against Sheehan in the sally port is for a jury to determine. Since the evidence is inconclusive and raises credibility and fact issues that preclude summary judgment, the defense of qualified immunity falls away. The Defendants' argument for qualified immunity is based on the assumption that the force used against Sheehan was reasonable under the circumstances. But since the Court cannot make that assumption, it likewise cannot conclude that the Defendants are entitled to qualified immunity. If a jury finds that any of the Defendants officers are liable for excessive force, then by definition they would not be entitled to qualified immunity. For these reasons, the Defendants' motion for summary judgment based on qualified immunity is denied.

## CONCLUSION

For the reasons discussed above, the motion to strike (DE 99) is DENIED and the motion for summary judgment (DE 85) is GRANTED in part and DENIED in part. The motion for summary judgment is GRANTED as to the Plaintiff's claims against individual defendants for

denial of medical care and GRANTED as to his claim against the Noble County Sheriff's

Department under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The

motion for summary judgment is DENIED as to Sheehan's claims for excessive force against

Defendants Moriarity, Chordas, Roehm, Barrientes, Morrison, Williams, and Keirn. This case

will be set for a status and scheduling conference by separate order.


Date: December 6 , 2016.


  /s/   William C. Lee  
William C. Lee, Judge
United States District Court
Northern District of Indiana